Welch, J.
The real question in this case is, What was the contract between the parties — did the company agree to carry the apple butter all the way to New York, or only to Dayton? Upon either construction of their contract, the law fixing the rights and liabilities of the parties seems to be reasonably well settled.
If the contract was to carry to Dayton only, there can be no pretence that it was not fully performed on the part of the railroad company. The goods were carried to Dayton in due time, and there safely delivered into the hands of another company, according to agreement.
On the other hand, if the contract is to be held as an undertaking to carry the goods to New York, what are the rights and liabilities of the parties ?
*235 It does not seem to be denied that the company had the legal capacity to make such a contract, or which is the same thing in effect, that it is estopped from denying its capacity to do so. That such is the settled law seems to be now well established. (2 Redf. on Railways, p. 9, sec. 152; id. p. 161; M. & W. 421; 21 Conn. 570; 27 Verm. 399; id. 110.)
It is equally well settled, in Ohio at least, that a common carrier cannot by any stipulation in his contract, or by any notice to the other party, exempt himself from liability for negligence or default of himself or agents. (2 Ohio St. 131; 4 id. 375; 10 id. 65; and C. P. & A. R. R. Co. v. Curran, (decided at the present term of this court*). He may, by such means, exempt himself from liability as insurer of the property, against accidents and unavoidable losses, but not against those arising from the acts or omissions of himself or his servants. It is quite clear, therefore, that if the company had made a contract to carry to Dayton only, and a similar proviso had been inserted against liability for loss happening on the company’s own road, the proviso would have been void, at least as to any loss occasioned by negligence or default. Now, if the contract is to be regarded as an undertaking to carry to New York, instead of Dayton, why should not the same rule of law apply % The same reasons of public policy seem to exist. The only éssential difference is, that in the latter case the distance covered by the undertaking is increased, and the number of the carrier’s agents is multipied ; and perhaps I might add, the company is assuming to exercise doubtful .powers in making the contract. It is difficult to see any reason in either of these facts for relaxing the rule of law in favor of the latter description of contract. Besides, if this was in fact a contract to carry the goods to New York, the company, in making it, was not and could not be acting as agent for any other carriers, and no one would be bound by it but itself. In that case the company’s delivery of the goods to the next carrier at Dayton would create no contract, express or implied, between that *236 carrier and the consignor, and would give the latter no right of action against the former, because the delivery would not be made as agent of the consignor. Between the consignor and the second carrier there would 'be, in that case, no connection. As between them the goods, though in fact in the hands of the second carrier, would be in law in the hands of the original party; and if the consignor had no remedy against the original party, he would have no remedy against any one. The same rule of public policy, which denies the right of exemption from loss arising from fault or negligence, and the same reasons supporting it, apply equally to such eases, as it does to contracts for carriage upon the carrier’s own road. Were the law otherwise, it would be in the power of one company to monopolize the business on the road of another, and thus escape the obligation and duty to the public of conducting that business with proper skill and care, which it was the object of the rule in question to enforce.
We think, therefore, that if the contract in question is to be regarded as an undertaking to carry the goods to New York, the company is liable for this loss. It occurred at Salamanca, while the goods were m transitu upon the line covered by the contract, and resulted from the negligence and default of the employees of the plaintiff in error, who was the carrier for the whole route, and who was the only party contracting with the owners, the defendants in error.
But what was the contract? Was it an undertaking to carry to New York, or was it an undertaking to carry to Dayton ? The parties have put their contract in writing, in the form of a receipt and agreement. This written contract determines their rights, and cannot be contradicted by parol proof. (4 Ohio, 334; 4 Ohio St. 362.) It acknowledges the receipt of the goods, “ to be transported Toy the Omeinnati, Hamilton, a/nd Dayton and Dayton de Michigan Maáhroad Oonypany to its termvnus, and there delivered;” with a proviso that the company’s liability shall cease upon such delivery. Language could not be much plainei\ Surely this bill of lading, apart from the mere description of the goods, imports *237 that the undertaking was to carry the goods no farther than to Dayton, the terminus of the companys’ own railroad, and to assume the liability of carriers only to that point.
Is this plain reading of the written contract to be contra-dieted and set aside by the fact that the goods were destined and marked for New Tork, and were described as being so marked in the bill of lading ? It was surely in the power of the parties, notwithstanding the destination of the goods, to make an express agreement that the company should only take them to Dayton. And had they undertaken to make such an agreement, they could hardly have embodied it in language more plain and direct than that they have used. No case is shown, English or American, where an explicit contract like this has been held to be overruled or varied, by the simple fact that the goods were received with the knowledge that they were consigned to a more distant point than that specified in the contract. The cases cited by counsel, and the argument founded upon them, are merely to the effect that such fact is sufficient frvma-fojcie evidence of a contract to carry the goods to their ultimate destination. This is now apparently settled as the law in England. The American cases are conflicting upon the question. But all the cases, so far as known to us, seem to proceed upon the admission that it can be no more than $rima-fac,ie evidence; that it is competent for the parties, by express stipulation or otherwise, to negative the presumption. It is, therefore, only in the absence of such express agreement that the question can ai’ise. We need not decide this question now. For if it be admitted that the consignment marks upon the goods are, in the absence of a contrary agreement, prima-faoie evidence of the distance they are to be carried, the answer in the present case is, that there was such contrary agreement.
The objection that the bill of lading was not signed by both parties is without validity. It is enough that it was signed by the company, and accepted and acquiesced in by the other party, and that there was no fraud, deceit, or mis *238 take accompanying the transaction. There are abundant authorities to this effect.
Judgment reversed, and cause remanded.
Bkinkeehoff, .0.J., and Scott, White, and Day, JJ., concurred.

 Ante, p. 1.